FILED

2008 Aug-11  AM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| Janet Riley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 07-G-1604-S |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Janet Riley, brings this action pursuant to the provisions

of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking

judicial review of a final adverse decision of the Commissioner of the Social

Security Administration (the Commissioner) denying her application for Social

Security Benefits.  Plaintiff timely pursued and exhausted her administrative

remedies available before the Commissioner.  Accordingly, this case is now ripe

for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C.

§ 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable

2

by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

In determining whether a claimant is disabled, Social Security

regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f).

The Commissioner must determine in sequence:

(1)     whether the claimant is currently employed;

(2)     whether she has a severe impairment;

(3)     whether her impairment meets or equals one listed by the
        Secretary;

(4)     whether the claimant can perform her past work; and

(5)     whether the claimant is capable of performing any work in the
        national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord  McDaniel v. Bowen,

800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One

and Two, she will automatically be found disabled if she suffers from a listed

impairment.  If the claimant does not have a listed impairment but cannot perform

her past work, the burden shifts to the Secretary to show that the claimant can

perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559

(11th Cir. 1995).

In the instant case, the ALJ, Robert L. Hodges, determined the

plaintiff met the first two tests, but concluded  did not suffer from a listed

impairment.  The ALJ found the plaintiff unable to perform her past relevant work.

Once it is determined that the plaintiff cannot return to his prior work, "the burden

shifts to the [Commissioner] to show other work the claimant can do."  Foote, at

1559.  When a claimant is not able to perform the full range of work at a particular

exertional level, the Commissioner may not exclusively rely on the Medical-

Vocational Guidelines (the grids).  Foote, at 1558-59.  The presence of a non-

exertional impairment (such as pain, fatigue or mental illness) also prevents

exclusive reliance on the grids.  Foote, at 1559.  In such cases "the

[Commissioner] must seek expert vocational testimony.  Foote, at 1559.

## THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

As the Sixth Circuit has noted:  "It is firmly established that the

medical opinion of a treating physician must be accorded greater weight than those

of physicians employed by the government to defend against a disability claim."

Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988).  "The testimony of a treating

physician must ordinarily be given substantial or considerable weight unless good

cause is shown to the contrary."  McGregor v. Bowen, 786 F.2d 1050, 1053 (11th

Cir. 1986); accord Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th

Cir. 1991).  In addition, the Commissioner "must specify what weight is given to a

treating physician's opinion and any reason for giving it no weight ...."

McGregor, 786 F.2d at 1053.  If the Commissioner ignores or fails to properly

refute a treating physician's testimony, as a matter of law that testimony must be

accepted as true.  McGregor, 786 F.2d at 1053; Elam, 921 F.2d at 1216.  The

Commissioner's reasons for refusing to credit a claimant's treating physician must

be supported by substantial evidence.  See McGregor, 786 F.2d at 1054; cf. Hale

v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987)(articulation of reasons for not

crediting a claimant's subjective pain testimony must be supported by substantial

evidence).

## DISCUSSION

The plaintiff alleges she is disabled due to a pseudo-seizure disorder.

A pseudoseizure is "an attack resembling an epileptic seizure but having purely

psychological causes, lacking the electroencephalographic changes of epilepsy,

and sometimes able to be stopped by an act of will."  (See,

http://medical-dictionary.thefreedictionary.com/pseudoseizure">pseudoseizure.)

The terminology in this area has been varied, with such episodes being referred to

as "pseudoseizures, nonepileptic seizures, nonepileptic events, and psychogenic

seizures" with psychogenic nonepileptic seizures ("PNES") being the preferred

term.  (http://www.emedicine.com/NEURO/topic403.htm)   PNES "are

paroxysmal episodes that resemble and are often misdiagnosed as epileptic

seizures; however, PNES are psychological in origin."  Id.

　　　　The plaintiff's treating neurologist, Dr. Alapati, initially believed the

plaintiff's PNES might have been epileptic in origin, but testing revealed no

physiological cause.  In December 2003 the plaintiff's sister accompanied her to

see Dr. Alapati and described one of her episodes.  Dr. Alapati noted that "[t]he

history of the episodes given by her sister was not suggestive of epileptic

seizures."  Record 228.  In this treatment note Dr. Alapati stated: "I am not

convinced that her episodes are true seizures.  I do not think that we need to start

her own anti-epileptic medications on an empirical basis."  Record 228.  On

January 30, 2004, Dr. Alapati saw the plaintiff and noted she had two seizures

around Christmas time and another in January.  Dr. Alapati noted as follows: "She

passed out.  The patient told me that when she came out of the seizure, she was

still shaking her whole body.  She was aware.  She does not go with a true

seizure."  Record 227.

　　　　On a form completed September 12, 2005, Dr. Alapati indicated the

plaintiff had "not epileptic seizures" that included loss of consciousness.  Record

361.  He indicated the seizures occur on average twice per month and typically last

three to five minutes.  Record 361.  He indicated the plaintiff has confusion

following the episodes that lasts 10 to 15 minutes.  Record 362.  The form

indicates the plaintiff also has depression and would be incapable of even low

stress jobs.  Record 364.  There's also a May 25, 2006, deposition of Dr. Alapati in

the record.  In that deposition Dr. Alapati reiterated his opinion the plaintiff would

be unable to perform even in a low stress job.  Record 142.  When asked whether

the plaintiff would be able to maintain a 40 hour work week and a competitive

work environment, Dr. Alapati replied: "probably not."  Record 142.

    The plaintiff's treating primary care physician, Dr. Ervin, completed

an RFC questionnaire indicating the plaintiff was diagnosed with syncope and

"possible atypical panic disorder."  Record 348.  In response to the question:

"Does your patient have seizures/blackouts?"  Dr. Ervin wrote: "unclear."  Record

348.  Dr. Ervin wrote that the plaintiff's treating neurologist Dr. Alapati, and the

plaintiff's treating psychiatrist, Dr. Sharp, should be contacted for details.  Record

348.

    Dr. Sharp, the plaintiff's treating psychiatrist initially saw the plaintiff

as a consultative examiner on May 25, 2004.  At that time he assigned the plaintiff

a GAF of 45.[1]  Record 410.  Dr. Sharp believed some of the plaintiff's symptoms

"are actually suggestive of atypical panic attacks."  Record 410.  Dr. Sharp noted

as follows:

> There is not enough evidence to support a diagnosis of panic disorder
> at this point.  However, I would suggest she undergo an empiric trail
> [sic] of an SSRI.  She does not appear to be malingering, nor does she
> appear to have a somatoform condition.
>
> Ms. Robinson currently seems to be impaired from any type of work,
> until these symptoms are better controlled, I don't feel that
> Vocational Rehabilitation is [] appropriate at this time.  To determine
> if this is a psychiatric impairment would require a long-term treatment
> relationship with the patient.

Record 410.  Dr. Sharp did in fact start seeing the plaintiff in a treating

relationship.  On August 26, 2005, the plaintiff saw Dr. Sharp.  She reported

feeling depressed, was having bad headaches, memory loss, irritability,

moodiness, insomnia, anger, and "doesn't want to get out a bed."  Record 406.

She reported that she was still passing out with bladder incontinence.  Record 406.

Dr. Sharp's diagnostic assessment was major depression, moderate; anxiety NOS;

and "?  panic d/o."  Record 406.  The plaintiff did not show up for an October 7,

2005 appointment.  On October 27, 2005, the plaintiff reported she was still

---

[1]  A GAF of 41-50 indicates:  "**Serious symptoms** (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) **or any serious impairment in social,
occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV
at 32 (emphasis in original).

having the same problems but had run out of Paxil one month previously.  Record

403.  The treatment note states: "She began to calm down [with] Paxil but she was

still passing out, [and] had 2 spells Saturday."  Record 403.  Dr. Sharp's diagnostic

assessment was the same as the previous treatment note except that "probably"

was written above the question mark in front of panic disorder.  The plaintiff was

to resume Paxil.  Record 403.

After the hearing, the ALJ requested plaintiff's attorney to inquire

whether Dr. Sharp would fill out a mental assessment form.  Record 127.  In

response to a letter dated April 18, 2006, from the plaintiff's attorney, Dr. Sharp

wrote the following:

> I'm unable to complete the form – Have not performed a full
> evaluation since May 2004, and have only seen patient briefly on two
> occasions since January.  I have not had the opportunity to evaluate
> her while she was following a consistent treatment program.

Record 127.

The plaintiff was seen by Dr. Walker, a board certified

neuropsychologist, at the request of the Commissioner.  Dr. Walker administered

IQ and other testing.  The plaintiff's IQ scores were as follows:

| Verbal | Performance | Full Scale |
|:------:|:-----------:|:----------:|
| 66 | 67 | 63 |

Dr. Walker's diagnostic impression on Axis I was "Pseudoseizures (Conversion Disorder)," and on Axis II "Borderline Intellectual Functioning."[2] Record 393.  Dr. Walker opined the plaintiff would have a "marked" limitation in her ability to respond appropriately to customers or other members of the general public.  Record 398.

Also in the record is a vocational report from Thomas M. Elliott.  Mr. Elliott review the plaintiff's medical history and administered IQ testing.  The test results reported by Mr. Elliott were as follows:

| Verbal | Performance | Full Scale |
| --- | --- | --- |
| 73 | 79 | 73 |

Mr. Elliott opined as follows about the plaintiff's ability to work:

> She has adverse vocational profile with borderline intellect, marginal reading skills and unskilled work history as well as continuing medical/psychological problems.  Due to the continuing frequency of her passing out spells with no apparent forewarning, and the subsequent weakness following one, Mrs. Riley is presently considered unable to sustain any example of gainful employment.

Record 116.

---

[2]  The plaintiff does not argue on appeal that she meets Listing 12.05C.  The ALJ found the plaintiff did not meet Listing 12.05C because Mr. Elliott's testing, which was administered first, yielded scores that would not meet the Listing.  The ALJ also noted the plaintiff received a high school diploma, had no special education background (the plaintiff's school records do not appear to show special education classes, even though she told Dr. Walker that she had taken such classes), and there was no evidence for a pre-age 22 IQ at the mental retardation level.  Record 32.

In spite of the opinions of both the plaintiff's treating neurologist and
treating psychiatrist that she was unable to work, the ALJ found that the plaintiff's
ability to respond to the mental demands of work was as set forth in the mental
medical source opinion of the Commissioner's consultative examiner Dr. Walker.
The ALJ's opinion shows that he had no understanding of the nature of the
plaintiff's condition.  Throughout the ALJ's decision he emphasized the negative
test results to find that the plaintiff did not suffer from episodes of passing out.
For example the ALJ stated as follows:

> Although the claimant alleges frequent episodes of passing out there
> is no real basis for this.  MRI of the brain was normal.  Tilt table
> study for vasodepression syndrome was negative.  Lab results showed
> normal electrolytes, CBC slightly decreased white blood cell count.
> Dr. Ervin even stated that it was unclear whether the claimant has
> seizures and blackouts.

Record 33.  These statements by the ALJ show his ignorance of PNES.  The test
results recited by the ALJ actually support finding the plaintiff's "seizures" to be
PNES because they failed to show the presence of a physiological cause for them.

Subsequent to the hearing, the ALJ propounded interrogatories to Dr.
Todorov, who is board certified in psychiatry and neurology, with added
qualifications in clinical neurophysiology.  The ALJ inquired of Dr. Todorov
whether the plaintiff's "'pseudo seizures' as diagnosed by Dr. Alipati [sic]"
medically equaled the epilepsy Listings.  Record 121.  Dr. Todorov replied that

11

"non-epileptic seizures should not be considered under [the epilepsy Listings].

The patient should be evaluated by a psychiatrist."  Record 121.  The ALJ also

asked Dr. Todorov for his opinion as to the etiology of the claimant's "pseudo

seizures."  Dr. Todorov replied: "Non-epileptic seizures are an attention seeking

call for help events [sic].  They are usually seen in patients with anxiety and

depression especially during stressful periods in their lives."  Record 121.  The

plaintiff's attorney was afforded an opportunity to propound additional questions

to Dr. Todorov, and he requested that two questions be asked.  Record 126.  The

questions, Dr. Todorov's reply, follow:

> 1.  Can a patient suffer non-epileptic seizures that are disabling?
>
>> No.  The nonepileptic seizures are not disabling.  A disability is from
>> an underlying disorder such as depression.
>
> 2.  Would you agree a patient's primary treating physician is in the best
> position to evaluate, document and render an opinion relative [sic] physical
> and mental limitations?
>
>> No.

Record 147.  The attorney's second question is ambiguous, in that "primary

treating physician" might be interpreted as "primary care physician."  It would

appear plaintiff's attorney did not intend it to have this meaning.  In a previous

letter to the ALJ the attorney objected to Dr. Todorov's first answers.  Record 125.

The attorney wrote that Dr. Alapati "should be considered a primary treating

physician." Record 125.  A more appropriate question to Dr. Todorov would have

been whether the plaintiff's treating neurologist was in the best position to

evaluate her limitations.

The ALJ's articulated reasons for rejecting the opinions of Drs.

Alapati and Sharp are as follows:

> The medical source opinions of both Dr. Alapati and Dr. Sharp...
> should be given limited weight, because they are based in large part
> upon the subjective complaints of the patient of frequent passing out
> spells, and the etiology of those spells is not the result of any
> medically documented impairment.  Dr. Sharp is unable to assess any
> Axis I or II diagnosis, and his Axis III diagnosis says "... Fainting
> spells of unknown etiology..." (Exhibit 20F) Dr. Alapati's medical
> source opinion at Exhibit 17F simply notes seizures "non-epileptic in
> origin..." and obviously tracks the claimant's subjective complaints.

Record 34 (emphasis added).  Therefore, the ALJ's refusal to credit the medical

source opinions of Drs. Alapati and Sharp rests upon his conclusion that the

plaintiff had not been diagnosed with any "medically documented impairment"

that could cause her subjective complaints.

This reasoning ignores the diagnosis of the Commissioner's own

consultant, Dr. Walker, whose diagnosis on Axis I was "Pseudoseizures

(Conversion Disorder)."  Record 393.  Conversion disorder is a recognized mental

disorder by the DSM-IV.  More importantly, it's symptoms are

pseudoneurological in nature and can include seizures or convulsions.  DSM-IV

452.  It is also important to note that a conversion disorder's symptoms are not intentionally produced:  "Although the individual may derive secondary gain from the conversion symptom, unlike in Malingering or Factitious Disorder the symptoms are not intentionally produced to obtain the benefits."  DSM-IV 454. Therefore, the Commissioner's own consultant, a neuropsychologist,[3] diagnosed the plaintiff as having a condition that could cause her "seizures" or passing out spells.

The plaintiff's treating neurologist, Dr. Alapati, in his deposition made crystal clear that he believed the plaintiff suffered nonepileptic seizures, which is another word for PNES.  Dr. Alapati testified about the difference between epileptic and nonepileptic seizures as follows: "Epileptic is something that happens to the brain activity, causing – resulting in a seizure.  ... And a nonepileptic seizures is something – it is stress or subconsciously.  ... In a clinical term it is called a seizure, but in a technical term it is a non-epileptic seizure." Record 140.  Dr. Alapati was asked the following question about the difference between the two types of seizures: "It doesn't make them any less real for [the] patient, though, does it?"  He replied: "Not for the patient."  Record 140.

---

[3]  Dr. Alapati in his deposition testified that neuropsychologists are experts in non-epileptic seizures.  Record 143.

Therefore, when Dr. Alapati diagnosed the plaintiff as having nonepileptic seizures, his diagnosis was equivalent to a diagnosis of PNES.

Contrary to the ALJ's assertion in his decision, the plaintiff has been diagnosed with a medical condition that could cause the symptoms about which she complains.  All of the medical professionals who treated the plaintiff believed she was suffering "seizures."  This is clearly demonstrated by the extensive testing that was ordered in order to determine the cause of the plaintiff's seizures.  These tests included an MRI of the brain, an EEG, a Holter monitor test, nerve conduction studies, and a tilt-table test.  Neither the plaintiff's treating physicians, nor the Commissioner's consultative psychologist questioned that the plaintiff's symptoms were real.  Dr. Todorov understood the significance of the diagnosis of nonepileptic seizures, because he opined the plaintiff should be evaluated by a psychiatrist and observed that nonepileptic seizures "are usually seen in patients with anxiety and depression especially during stressful periods in their lives." Record 130.  Dr. Sharp, the plaintiff's treating psychiatrist diagnosed the plaintiff as having Major Depression, Moderate; Anxiety NOS; and a probable panic disorder.  According to Dr. Todorov, these are precisely the sorts of psychiatric conditions that could cause the plaintiff's PNES.

There is no evidence in the medical record to support the ALJ's finding the plaintiff does not suffer from a medical condition that could cause her PNES.  Therefore, his refusal to accept Dr. Alapati's opinions about the plaintiff's ability to work is not supported by substantial evidence and they must be accepted as true under the law of the Eleventh Circuit.  The vocational expert testified that if the plaintiff were incapable of performing even low stress jobs, which was Dr. Alapati's assessment, all work would be precluded.  Record 455.  Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work.  Accordingly, the plaintiff is disabled within the meaning of the Social Security Act.  An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED 11 August 2008.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.